O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LONG BEACH MEMORIAL MEDICAL CENTER, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, <br><br> Defendants. | Case No. CV 20-03799 DDP (RAOx) <br><br> **ORDER GRANTING PETITION TO VACATE ARBITRATION AWARD IN PART AND DENYING PETITION IN SUBSTANTIAL PART** [Dkt. No. 1] |

Presently before the court is Petitioner Long Beach Memorial Medical Center ("the Hospital")'s Petitioner to Vacate Arbitration Award. Having considered the submissions of the parties and heard oral argument, the court denies the petition in substantial part, grants the petition in part, and adopts the following Order.

**I.   Background**

In June 2018, Hospital phlebotomist Daniel Navarro began to draw patient Z's blood in her hospital room. According to Navarro, the patient's arm was too close him, so he moved her arm because he didn't "want anybody getting the wrong idea." Navarro asked

whether Patient Z was in pain, and she responded that she was used to being stuck with needles. Navarro then told her, "Well, we won't bring any whips or chains to beat you with." As Navarro was leaving the room, he also asked Patient Z whether her boots, which were on the floor nearby, were made of leather.

Patient Z complained that Navarro's statements were unprofessional and of a sexual nature. According to Patient Z, Navarro said, "you don't want other people to think you are doing anything else with that arm," implying a sexual act. Patient Z also alleged that Navarro asked her whether she had any chains or handcuffs, and said that her boots should be leather.

Navarro was disciplined, in writing, for violating a Hospital policy that "[Hospital] employee[s] and other representatives are expect to project[] police and friendly behavior toward [Hospital] patient[s]," and was required to complete workplace harassment training. Navarro was also verbally instructed to avoid all contact with Patient Z. Navarro did not grieve the disciplinary memorandum or measures.

Approximately two weeks later, Navarro was assigned to draw Patient Z's blood. Navarro confirmed Patient Z's blood and said he was there to draw her blood, to which she responded, "Okay." An attending nurse, who remained present in the room, asked Navarro to "please get on with it." As Navarro was drawing Patient Z's blood, he began to wonder whether she was the patient he was not to contact. After finishing his duties, Navarro immediately contacted his supervisor and said, "I believe I think I drew this patient that had complained about me." Patient Z later complained, and

asked that Navarro never draw her blood again, even though he "was appropriate."

The Hospital terminated Navarro for insubordination, finding Navarro's claims that he did not realize that Patient Z was the same person were not credible. Navarro and Respondent, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("the Union") grieved the termination, which ultimately went to binding arbitration. The arbitrator concluded that Navarro's actions during the second blood draw warranted "serious disciplinary action against him." The arbitrator concluded, however, that termination was not appropriate, and that Navarro should instead be suspended for approximately eighteen months and required to undergo additional training. The Hospital now seeks to vacate the arbitrator's decision.

**II. Legal Standard**

"Because federal labor policy strongly favors the resolution of labor disputes through arbitration, judicial scrutiny of an arbitrator's decision is *extremely* limited." Matthews v. Nat'l Football League Mgmt. Council, 688 F.3d 1107, 1111 (9th Cir. 2012) (internal alterations omitted) (quoting United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms, 74 F.3d 169, 173 (9th Cir. 1995); see also Sw. Reg'l Council of Carpenters v. Drywall Dynamics, Inc., 823 F.3d 524, 530 (9th Cir. 2016) ("Because of the centrality of the arbitration process to stable collective bargaining relationships, courts reviewing labor arbitration awards afford a nearly unparalleled degree of deference to the arbitrator's decision." (internal quotation marks omitted)).

3

Notwithstanding allegations that an arbitrator made erroneous factual determinations or misunderstood a party's position, "[i]f an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." Major Leauge Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (internal quotation marks and citations omitted). "It is only when the arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." Id. (quoting Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597 (1960) (alteration in original)). In other words, an arbitration award will be set aside only in those instances where the arbitrator's decision "fails to draw its essence from" the underlying CBA. Sprewell v. Golden State Warriors, 231 F.3d 520, 526 (9th Cir. 2000); see also Hawaii Teamsters & Allied Workers Union, Local 996 v. United Parcel Serv., 241 F.3d 1177, 1178 (9th Cir. 2001) (explaining that a reviewing court's "task is to determine whether the arbitrator interpreted the collective bargaining agreement, not whether he did so correctly").

**III. Discussion**

    A.   Public Policy Exception

        1.   Sexual Harassment

Petitioner contends that the arbitrator's decision should be vacated because it runs counter to public policy against sexual harassment. An exception to the general rule of deference applies when an arbitration award is contrary to public policy. Matthews,

4

688 F.3d at 1111.  "The public policy exception is narrow, and courts should be reluctant to vacate arbitral awards on public policy grounds."  Drywall Dynamics, 823 F.3d at 534 (internal citations, quotation marks, and alterations omitted).  This Court can only vacate an arbitration award on public policy grounds if (1) an "explicit, well defined and dominant public policy exists" and (2), that policy "specifically militates against the relief ordered by the arbitrator."  Matthews, 688 F.3d at 1111.

The Hospital invokes a broad California Public Policy against "harassment."  Indeed, California law also reflects a public policy specifically targeting sexual harassment directed toward patients.  See Cal Bus. & Profs. Code § 726; Cal. Civil Code § 51.9.  The Hospital must still demonstrate, however, that public policy against sexual harassment directed against patients "specifically militates against" the arbitrator's determination that Navarro's insubordination, such as it was, justified an eighteen-month suspension rather than permanent termination of employment.

Notably, the Hospital's argument that Navarro's continued employment would frustrate public policy against sexual harassment runs counter to the Hospital's own disciplinary actions.  Of the two incidents involving Navarro, only the first involved sexual harassment.  Although the Hospital now argues that reinstating Navarro would violate public policy, it did not terminate him after that first, and only, incidence of harassment.  Rather, the Hospital terminated Navarro for insubordination after he drew Patient Z's blood a second time, notwithstanding that (1) Navarro behaved professionally and appropriately during the second blood draw, (2) Navarro was assigned to draw patient Z's blood, and (3)

5

Navarro was specifically directed to draw Patient Z's blood by an attending nurse.

The arbitrator did not review Navarro's termination for insubordination in a vacuum. The arbitrator acknowledged that Navarro's comments "of a sexual nature" during Patient Z's first blood draw were "unprofessional, inappropriate, and wholly unnecessary." The arbitrator explicitly recognized, however, that the details of that incident, and the ensuing disciplinary action, were not before him. The arbitrator's decision, rather, focused on whether Navarro's subsequent, professional, and appropriate contact with Patient Z constituted just cause to terminate him for insubordination.

In fulfilling his adjudicatory responsibilities, the arbitrator considered the termination sanction in the context of what Navarro was alleged to have committed, i.e., insubordination. The arbitrator recognized that Navarro was "in a bit of a dilemma," having been simultaneously forbidden from and directed to interact with Patient Z, and that Navarro "felt a sense of obligation and duty to perform his job." The arbitrator also recognized Navarro's realization that he made the wrong decision, and his self-reporting to his supervisor. Furthermore, even though the first blood draw was not before the arbitrator, the arbitrator specifically distinguished the circumstances of the second blood draw, observing that Navarro was not "terminated for having committed any acts or having made any comments of a sexual[,] . . . unprofessional, unacceptable [or] inexcusable nature."

Having determined that Navarro was guilty of "extremely poor judgment" rather than intentional insubordination or reckless

6

behavior, the arbitrator found no just cause for permanent termination of employment. But the arbitrator did not let Navarro off lightly. The arbitrator imposed substantial sanctions on Navarro, including suspension for over one and a half years, mandatory workplace harassment training, an additional human resources meeting, and a continued no-contact directive with respect to Patient Z. Under these circumstances, this Court cannot conclude that California policy against sexual harassment "clearly militates against" the arbitrator's award. Therefore, the award does not fall within the ambit of the public policy exception.

        2. HIPAA

In addition to requiring an eighteen-month suspension and additional training, the arbitrator stated that Navarro "should also be given Patient Z's name again so that he can take the necessary steps to commit it to memory, write it down and keep it in a safe place, such as his wallet to refer to, if needed, (while keeping her name confidential) to ensure he knows patient Z's identity and does not draw her blood or have any contact with her in the future." The Hospital contends that this provision violates public policy by putting the Hospitable in the untenable position of violating the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. 104–191, 110 Stat. 1936. The court agrees. HIPAA requires the Hospital to "[e]nsure the confidentiality, integrity, and availability of all electronic protected health information" and "[p]rotect against any reasonably anticipated threats or hazards to the security or integrity of such information." 45 C.F.R. § 164.306(a). "Health information" includes any information that relates to the health of an

7

individual or provision of health care to an individual.  45 C.F.R. § 160.103.  An award requiring the Hospital to allow one of its employees to maintain the name of a patient on a piece of paper in his wallet at all times runs contrary to the public policy, enshrined in HIPAA, of protecting patient privacy, including an individual's status as a patient.  Accordingly, the portion of the arbitration award requiring the Hospital to "take the necessary steps" to help Navarro keep Patient Z's name written down "in a safe place" is vacated.

      B.    The arbitrator's "own brand of industrial justice"

The Hospital also argues, briefly, that the arbitrator dispensed his own brand of industrial justice, and that his award did not draw its essence from the parties' labor agreement.  This argument has no merit.  Like the public policy exception, the "own brand" or "draw its essence" exception is narrow and "*extremely* limited."  <u>Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, Int'l Ass'n of Machinists & Aerospace Workers</u>, 886 F.2d 1200, 1208 n.8 (9th Cir. 1989).  "The quality—that is, the degree of substantive validity—of an arbitrator's interpretation is, and always has been, beside the point. Instead, the appropriate question for a court to ask when determining whether to enforce a labor arbitration award interpreting a collective bargaining agreement is a simple binary one: Did the arbitrator look at and construe the contract, or did he not?"  <u>Drywall Dynamics</u>, 823 F.3d at 532.

Here, there is no dispute that under the relevant labor agreement, the Hospital could only terminate Navarro for just cause.  The arbitrator's entire decision centers on whether

8

Navarro's second blood draw, considering the mitigating factors and Navarro's unconvincing claims of ignorance, constituted sufficient just cause for his termination.  Because the arbitrator clearly considered the labor contract, this court's inquiry goes no further.

The Hospital also raises an argument that the arbitrator's decision did not draw its essence from the labor agreement because the arbitrator was not mentally competent to render a decision. Although not presented as such, this could be considered an argument that the arbitrator "dispensed his own brand of justice." The Hospital's argument is premised on the fact that the arbitrator issued a delayed "Written Confirmation of Oral Decision and Award," rather than a more formal written decision, and on the Hospital's counsel's declaration that the arbitrator stated to her that "he was suffering from a medical condition that impaired his cognitive functions, specifically, his ability to form complete, coherent thoughts and to transcribe those thoughts into a written decision." Declaration of Christina Rentz ¶¶ 10-11.  Although counsel states that the arbitrator made those statements in a Union representative's presence, that representative denies that the arbitrator made any statements about his cognitive abilities. Declaration of Dianne Kanish ¶ 13.  The Hospital's counsel's disputed, hearsay declaration does not provide this Court with any basis to conclude that the arbitrator's reasoned decision was based upon anything other than the parties' collective bargaining agreement.  Indeed, the Hospital's uncharitable and overstated characterization of the arbitrator's decision as a "meandering and disorganized four page statement" suggests that the Hospital's

9

fundamental objection is to the substantive validity of the decision.[1]  Disputed accounts of the arbitrator's mental state, however, cannot suffice to release the Hospital, or this Court, from the strictures of the extremely narrow "draw its essence" exception.

**IV. Conclusion**

For the reasons stated above, the Petition is DENIED, in substantial part, and GRANTED, in part.  The petition is GRANTED, and the arbitrator's award VACATED, insofar as it requires the Hospital to help Navarro maintain Patient Z's name in writing for his personal use.  In all other respects, the petition is DENIED.

IT IS SO ORDERED.

Dated: July 21, 2021

DEAN D. PREGERSON
United States District Judge

---

[1] Contrary to the Hospital's characterization, the decision is coherent and reasonably well-structured, and states the facts and the respective positions of the parties.